# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BRADLEY M. LEBEN,** | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv00034 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **JO ANNE B. BARNHART**, | ) | |
|  Commissioner of Social Security, | ) | By: PAMELA MEADE SARGENT |
|     Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Bradley M. Leben, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.* (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance."

-1-

*Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Leben protectively filed his applications for DIB and SSI on or about July 29, 2003, alleging disability as of July 29, 2003, based on diabetes, lung problems, fatigue, arthritis, leg pain, back pain, headaches and depression. (Record, ("R."), at 57-60, 64, 94, 217-20.) The claims were denied initially and upon reconsideration. (R. at 40-42, 45, 46-48, 223-25.) Leben then requested a hearing before an administrative law judge, ("ALJ"). (R. at 49.) The ALJ held two hearings on May 18, 2004, and January 20, 2005, at which Leben was represented by counsel. (R. at 265-94.)

By decision dated January 28, 2005, the ALJ denied Leben's claims. (R. at 18-27.) The ALJ found that Leben met the disability insured status requirements of the Act through the date of his decision. (R. at 26.) The ALJ found that Leben had not engaged in substantial gainful activity since the alleged onset date of disability. (R. at 26.) The ALJ also found that the medical evidence established that Leben suffered from severe impairments, namely diabetes mellitus, hypertension, hyperlipidemia, fibromyalgia, a dysthymic disorder, depression and a personality disorder, not otherwise specified with avoidant and dependent features, but he found that Leben did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26.) The ALJ found that Leben's allegations were not totally credible. (R. at 26.) The ALJ found that Leben retained the residual functional capacity to perform simple, low-stress light

work[1] that did not require working with the public. (R. at 26.) Thus, the ALJ found that Leben could not perform any of his past relevant work. (R. at 26.) Based on Leben's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Leben could perform jobs existing in significant numbers in the national economy. (R. at 26-27.) Thus, the ALJ found that Leben was not disabled under the Act and was not eligible for benefits. (R. at 27.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued his decision, Leben pursued his administrative appeals, (R. at 14), but the Appeals Council denied his request for review. (R. at 8-11.) Leben then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on Leben's motion for summary judgment filed January 9, 2006, and the Commissioner's motion for summary judgment filed February 2, 2006.

## *II. Facts*

Leben was born in 1958, (R. at 57), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2005). He has a high school education and vocational training in auto body repair and auto mechanics. (R. at 70, 268.) Leben has past relevant work experience as an auto body repairman, a lumber salesman and a carpet cleaner. (R. at 65, 75.)

---

[1] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

Leben testified that he was unable to work due to fatigue and depression. (R. at 270, 273-74.) He stated that he could stand for 15 minutes without interruption, sit for 30 minutes without interruption and walk up to 600 feet without interruption. (R. at 271-72, 284.) Leben stated that he could lift and carry items weighing up to 15 pounds. (R. at 272.) He stated that his hands would get weak, which caused him to drop things. (R. at 272.) Leben stated that no one had recommended that he seek mental health therapy. (R. at 288.)

Norman Hankins, a vocational expert, also testified at Leben's hearing. (R. at 289-92.) Hankins was asked to consider an individual of Leben's age, education and work experience and who had the residual functional capacity to perform simple, low-stress light work that would not require him to regularly interact with the general public. (R. at 290.) Hankins stated that there were jobs available that such an individual could perform, including those of an office cleaner, a janitor, a laundry worker, a kitchen worker, a bagger, a packer, an assembler, a sorter and an off bearer. (R. at 290-91.) Hankins was asked to consider the same individual, but who was mentally limited as indicated by Edward E. Latham, Ph.D. (R. at 181-87, 291.) Hankins stated that the limitations indicated by Latham were very similar to those previously posed to him and that the jobs previously identified could be performed with those limitations. (R. at 291-92.)

In rendering his decision, the ALJ reviewed reports from Clinch River Health Services; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Karl W. Konrad, Ph.D., M.D.; Edward E. Latham, Ph.D., a clinical psychologist; University of Virginia Health System; and Frontier Health. Leben's attorney also submitted medical reports from Clinch River Health Services, Frontier Health and the University of Virginia

-4-

Health System to the Appeals Council.[2]

The record shows that Leben was treated by Clinch River Health Services from December 1999 through April 2005. (R. at 102-22, 131-46, 148-55, 166-80, 188-98, 203-16, 230-33.) In November 2001, Leben reported that he was not doing well. (R. at 139.) He reported that he had lost his job and had gained weight. (R. at 139.) In November 2002, Leben reported no chest pains, shortness of breath, visual changes or changes in sensation in his lower extremities. (R. at 136.) His diabetes was fairly controlled with medication. (R. at 136.) In December 2002, Leben reported multiple joint pain and stated that the pain impaired his ability to function at work. (R. at 135.) On examination, Leben had full range of motion of his shoulders and 5/5 strength in his upper and lower extremities. (R. at 135.) He was diagnosed with arthralgia. (R. at 135.) In March 2003, Leben reported that overall he was doing well and had no specific problem to report. (R. at 105.) In July 2003, Leben's diabetes, hypertension and hyperlipidemia were fairly stable. (R. at 103.) He was diagnosed with fatigue and given a B-12 shot. (R. at 103.) In October 2003, Leben reported he had quit taking Tricor a year ago because it made his legs hurt and that he was no longer taking Glucophage. (R. at 134.) He reported that he was unable to walk due to leg pain. (R. at 134.) On December 11, 2003, Leben complained of muscle pain. (R. at 132.) He stated that he had a lot of respiratory problems at times. (R. at 132.) He was diagnosed with diabetes, hyperlipidemia and neuropathy. (R. at 132.) On December 12, 2003, blood tests showed Leben's triglyceride level to be 1548 and his cholesterol level to be 327. (R. at 144.)

---

[2]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 8-11), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

On September 22, 2004, Leben complained of exhaustion and muscle pain. (R. at 189.) He was diagnosed with diabetes mellitus, not controlled, borderline hypertension and fatigue of an unknown etiology. (R. at 189.) On September 29, 2004, arthritic and heavy metal toxic testing were normal. (R. at 189.) On October 4, 2004, Leben complained of persistent fatigue and pain. (R. at 188.) He was diagnosed with fibromyalgia. (R. at 188.) In January 2005, Dr. Gary E. Michael, M.D., reported that Leben had complained of chronic and severe fatigue, diffuse body pain and joint pain. (R. at 204.) He encouraged Leben to increase his low impact aerobic activity, reduce his weight and improve his glucose control. (R. at 204.) On April 25, 2005, Leben complained of neck pain. (R. at 230.) He was diagnosed with fibromyalgia and neck pain. (R. at 230.)

On August 29, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, indicated that Leben had the residual functional capacity to perform medium work.[3] (R. at 123-30.) He indicated that Leben could frequently climb, balance, stoop, kneel, crouch and crawl. (R. at 125.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 126-27.) This assessment was affirmed by Dr. Michael J. Hartman, M.D., another state agency physician, on November 21, 2003. (R. at 130.)

On June 23, 2004, Dr. Karl W. Konrad, Ph.D., M.D., evaluated Leben at the request of Disability Determination Services. (R. at 156-58.) Leben complained of shortness of breath with exertion. (R. at 156.) He reported that he had an Albuterol inhaler, which he used on an as needed basis. (R. at 156.) Dr. Konrad reported that

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

Leben had full range of motion of all joints. (R. at 157.) He found no tenderness, heat, swelling or deformity in any joint. (R. at 157.) Leben had full range of motion in his neck. (R. at 157.) His back had normal lumbar flexure, no tenderness or muscle spasm and full range of motion. (R. at 157.) Straight leg raising tests were negative. (R. at 157.) Leben had normal coordination, gait and strength. (R. at 157.) His grip strength was also normal. (R. at 157.) No sensory radiculopathy or peripheral neuropathy was noted. (R. at 157.) Leben's blood pressure reading was 150/97. (R. at 157.) Breath sounds were clear without rales, rhonchi or wheezes. (R. at 157.) Leben's thoughts and ideas were normal and his behavior was appropriate. (R. at 158.) His memory for past and present events was normal. (R. at 158.) Leben's affect was normal. (R. at 158.) Examination was remarkable for mild hypertension. (R. at 158.) A pulmonary function study indicated that Leben's timed vital capacity level, ("TVC"), was at 70 percent and his forced expiratory volume for one second, ("$FEV_1$") was at 82 percent. (R. at 162.) Leben was diagnosed with diabetes and elevated blood pressure. (R. at 158.)

Dr. Konrad completed an assessment indicating that Leben's ability to lift and carry items was not impaired, as was his ability to stand, walk and sit. (R. at 159-61.) He indicated that Leben could frequently climb, stoop, kneel, balance, crouch and crawl. (R. at 160.) Leben's ability to reach, handle, feel, push/pull, see, hear and speak was not impaired. (R. at 160.) No environmental restrictions were noted. (R. at 161.)

On September 7, 2004, Edward E. Latham, Ph.D., a clinical psychologist, evaluated Leben at the request of Disability Determination Services. (R. at 181-84.) Latham indicated that Leben showed no pathological disturbances in thought processes, thought content or perception. (R. at 181.) Leben's mood was moderately

-7-

Case 2:05-cv-00034-JPJ-PMS   Document 21   Filed 05/01/06   Page 7 of 18   Pageid#: 83

depressed with periods of irritability and his affect was appropriate with respect to thought content. (R. at 182.) Leben denied mental health treatment. (R. at 182.) He reported that medication had helped his mood swings, but had not stopped them. (R. at 182.) Leben showed evidence of emotional disturbance. (R. at 183.) Latham diagnosed dysthymic disorder, early onset, rule out chronic major depressive disorder, social phobia, provisional and personality disorder, not otherwise specified with avoidant and depressive features. (R. at 183.)

Latham completed a mental assessment indicating that Leben had a satisfactory ability to follow work rules, to use judgment, to interact with supervisors, to function independently, to maintain attention/concentration, to understand, remember and carry out complex, detailed and simple instructions, to maintain personal appearance and to demonstrate reliability. (R. at 185-87.) He indicated that Leben was seriously limited, but not precluded, in his ability to relate to co-workers, to deal with the public, to deal with work stresses, to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 185-86.)

On February 25, 2005, Leben was seen by Dr. Shu Man Fu, M.D., for complaints of pain in his legs, hips, shoulders, neck, arms, hands and back. (R. at 227-29.) He also reported extreme fatigue. (R. at 227.) Leben had bilateral trochanteric bursitis, right shoulder pain, anserine bursitis and femoral bursitis. (R. at 228.) Dr. Fu injected Leben's right shoulder and hips, which gave Leben increased range of motion without pain. (R. at 228.) Dr. Fu discussed with Leben the need for physical therapy, but Leben declined due to financial reasons. (R. at 228.) Dr. Fu advised Leben to stretch and resume riding a bicycle on a flat surface. (R. at 228.)

Leben began treatment with Frontier Health on March 2, 2005. (R. at 251-54.) Leben reported that he was very short-tempered and had not been able to keep a job for the previous two to three years. (R. at 251.) He reported that he could not concentrate, became agitated easily and had poor sleep and appetite. (R. at 251.) He was diagnosed with major depressive disorder, recurrent, severe without psychotic features. (R. at 252.) He was assessed a Global Assessment of Functioning, ("GAF"), score of 50.[4] (R. at 252.) On March 8, 2005, Leben reported have difficulty with crowds and people in general. (R. at 248-50.) It was reported that Leben demonstrated appropriate activities of daily living and behavior. (R. at 249.) He reported depression, mood swings and anxiety. (R. at 249.) On April 12, 2005, Leben reported that he had been doing well. (R. at 239.) He stated that he felt like he was on a roller coaster because he never knew what mood he would be in from one day to the next. (R. at 239.) Leben's interactions were reported to be friendly and appropriate and his mood was euthymic. (R. at 239.) On April 18, 2005, Dr. James M. Turnbull, M.D., reported that Leben's thinking was logical, coherent and goal directed with no evidence of a thought disorder. (R. at 236.) He was diagnosed with bipolar disorder, II. (R. at 236.) Dr. Turnbull assessed a then-current GAF score of 50 with his highest and lowest GAF score being 50 in the previous six months. (R. at 236.) On May 2, 2005, it was reported that Leben's interactions were friendly and appropriate. (R. at 235.) He reported no new psychiatric symptoms. (R. at 235.) His thoughts were coherent and logical and his mood was slightly dysthymic. (R. at 235.)

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated January 28, 2005, the ALJ denied Leben's claims. (R. at 18-27.) The ALJ found that the medical evidence established that Leben suffered from severe impairments, namely diabetes mellitus, hypertension, hyperlipidemia,

-10-

fibromyalgia, a dysthymic disorder, depression and a personality disorder, not otherwise specified with avoidant and dependent features, but he found that Leben did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 26.) The ALJ found that Leben's allegations were not totally credible. (R. at 26.) The ALJ found that Leben retained the residual functional capacity to perform simple, low-stress light work that did not require working with the public. (R. at 26.) Thus, the ALJ found that Leben could not perform any of his past relevant work. (R. at 26.) Based on Leben's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Leben could perform jobs existing in significant numbers in the national economy. (R. at 26-27.) Thus, the ALJ found that Leben was not disabled under the Act and was not eligible for benefits. (R. at 27.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907

-11-

F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Leben argues that the ALJ's decision that he is not disabled is not supported by substantial evidence of record. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-8.) He also argues that the ALJ erred by failing to properly consider the impact of fibromyalgia, fatigue and pain on his ability to work. (Plaintiff's Brief at 15-21.) Leben further argues that the ALJ failed to establish that there is other work in the national economy that he could perform. (Plaintiff's Brief at 8-15.)

The ALJ found that Leben had the residual functional capacity to perform simple, low-stress light work that did not require working with the public. (R. at 26.) Based on my review of the record, I find that substantial evidence exists to support this finding. In August 2003, the state agency physician, found that Leben had the residual functional capacity to perform medium work. (R. at 123-30.) In June 2004, Dr. Konrad's examination of Leben was within normal limits. (R. at 156-58.) Dr. Konrad indicated that Leben's ability to lift and carry objects was not impaired, as well as his ability to stand, walk and sit. (R. at 159-61.)

Leben also argues that the ALJ failed to establish that there is other work in the

-12-

national economy that he could perform. (Plaintiff's Brief at 8-15.) Based on my review of the record, I agree. As noted above, the ALJ in this case found that Leben retained the residual functional capacity to perform simple, low-stress light work *that did not require working with the public*. (R. at 26.) The ALJ relied upon the testimony of a vocational expert to determine that other jobs existed in the economy that Leben could perform. (R. at 26.) The vocational expert was asked to assume an individual of Leben's age, education and work experience who retained the residual functional capacity to perform simple, low-stress light work *that would not require him to regularly interact with the general public.* (R. 290.) The vocational expert identified jobs that such an individual could perform, including jobs as an office cleaner, a janitor, a laundry worker, a kitchen worker, a bagger, a packer, an assembler, a sorter and an off bearer. (R. 290-91.) However, neither the vocational expert nor the ALJ articulated the occupational codes of the Dictionary of Occupational Titles, ("DOT"), of the jobs they believed Leben was capable of performing. A review of the DOT for the jobs noted above reveals inconsistencies regarding the exertional levels of these jobs, which the vocational expert testified required "light" exertion. The DOT classifies the above jobs as medium and heavy.[5] For example, the DOT contains the following:

1) Offbearer, Pipe Smoking Machine, alternate titles: pipe smoking machine operator. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Offbearer, Pipe Smoking Machine, Occupational Code 563.686-018 at 455 (4th ed. rev. 1991).

---

[5]Heavy work involves lifting objects weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2005).

-13-

2) Offbearer, Sewer Pipe, alternate titles: auger-machine offbearer; turner. The DOT notes the exertional requirement to perform this job as heavy. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Offbearer, Sewer Pipe, Occupational Code 579.686-026 at 477 (4th ed. rev. 1991).

3) Cleaner, Commercial or Institutional (any industry), alternate titles: clean-up worker; housekeeper, janitor; laborer, building maintenance; mopper; porter; scrubber; sweeper. The DOT notes the exertional requirement to perform this job as heavy. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Cleaner, Commercial or Institutional, Occupational Code 381.687-014 at 282 (4th ed. rev. 1991).

4) Cleaner, Furniture, alternate titles: bed washer; furniture cleaner; metal cleaner. The DOT notes the exertional requirement to perform this job as medium. *See* 2 DICTIONARY OF OCCUPATIONAL TITLES Cleaner, Furniture, Occupational Code 709.687-014 at 699 (4th ed. rev. 1991).

5) Janitor (any industry), alternate titles: maintenance engineer; superintendent, building. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Janitor, Occupational Code 382.664-010 at 282 (4th ed. rev. 1991).

6) Cleaner, Industrial (any industry), alternate titles: clean-up worker; janitor; sanitor; scrubber; sweeper; trash collector; vacuum cleaner; waste collector. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Cleaner, Industrial, Occupational Code 381.687-018 at 282 (4th ed. rev. 1991).

7) Laundry Laborer, alternate titles: bundle clerk. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Laundry Laborer, Occupational Code

361.687-018 at 261 (4th ed. rev. 1991).

8) Laundry-Machine Tender. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Laundry-Machine Tender, Occupational Code 589.685-066 at 499 (4th ed. rev. 1991).

9) Laundry Operator. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Laundry Operator, Occupational Code 369.684-014 at 266 (4th ed. rev. 1991).

10) Launderer, Hand. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Launderer, Hand, Occupational Code 361.684-010 at 260 (4th ed. rev. 1991).

11) Laundry Worker I, alternate titles: camp-laundry operator; company laundry worker. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Laundry Worker I, Occupational Code 361.684-014 at 260 (4th ed. rev. 1991).

12) Laundry Worker II. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Laundry Worker II, Occupational Code 361.685-018 at 261 (4th ed. rev. 1991).

13) Kitchen Clerk (hotel & rest.), alternate titles: storeroom food-checker. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Kitchen Clerk, Occupational Code 222.587-022 at 203 (4th ed. rev. 1991).

14) Kitchen Helper (hotel & rest.), alternate titles: cookee; cook helper; kitchen hand; kitchen porter; kitchen runner. The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Kitchen Helper, Occupational Code 318.687-

010 at 245-46 (4th ed. rev. 1991).

15) Kitchen Steward/Stewardess (hotel & rest.). The DOT notes the exertional requirement to perform this job as medium. *See* 1 DICTIONARY OF OCCUPATIONAL TITLES Kitchen Steward/Stewardess, Occupational Code 318.137-010 at 245 (4th ed. rev. 1991).

Neither the vocational expert nor the ALJ offered any explanation of these discrepancies.

Futhermore, the ALJ found that Leben should *not be required to work with the public*. (R. at 26.) His question to the vocational expert indicated that Leben required a job *that did not require him to regularly interact with the general public*. (R. at 290.) Based on this, I cannot find that substantial evidence exists to support the ALJ's finding that jobs exist in significant numbers in the economy that Leben could perform.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does exist to support the ALJ's finding with regard to Leben's physical residual functional capacity;

2. Substantial evidence does not exist to support the ALJ's finding that a significant number of jobs exists that Leben could perform; and

3. Substantial evidence does not exist to support the ALJ's finding that Leben was not disabled under the Act.

-16-

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Leben's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand this case to the Commissioner for further development.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 1993 & Supp. 2005):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: This 1st day of May 2006.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE